## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                  No. CR 15-1285 JB

ELIJAH SHIRLEY;
MAYNARD SHIRLEY and
MICHAEL SHIRLEY

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the United States Motion *In Limine* to Permit Testimony of Unavailable Witness As a Statement Against Interest, filed October 12, 2016 (Doc. 135)("Motion").  The primary issue is whether the Court should admit Defendant Elijah Shirley's statement, allegedly made to Cornelia Jim, the mother of E. Shirley's ex-girlfriend Valerie Jim, in the early morning hours of March 21, 2015, that he was "going to go kick his ass" in reference to Brandon BlueEyes, V. Jim's new boyfriend and the deceased victim in this case.  Plaintiff United States of America seeks to admit E. Shirley's statement against Defendant Maynard Shirley, the sole Defendant who has decided to go to trial.  The Court will exclude the statement as inadmissible hearsay, because E. Shirley's statement does not qualify as a statement against interest under rule 804(b)(3) of the Federal Rules of Evidence, and because it does not rise to the level of an excited utterance under rule 803(2) of the Federal Rules of Evidence.

## FACTUAL BACKGROUND

The Court takes its facts primarily from: (i) the Amended Criminal Complaint, filed March 25, 2015 (Doc. 4)("Amended Complaint"); (ii) the Transcript of Preliminary/Detention Hearing held on March 30, 2015, filed May 6, 2015 (Doc. 36)("Preliminary Hearing Tr."); and (iii) the United

States' Motion *In Limine* to Admit Evidence [sic] *Res Gestae* Evidence Not Charged in the

Indictment Pursuant to Federal Rules of Evidence 401, 403, 404(B), filed August 29, 2016 (Doc.

77)("Res Gestae Motion").  The Court relies on these factual accounts for background purposes

only, as Maynard Shirley is presumed innocent until proven guilty at trial.  This presumption of

innocence, which is always important, is especially important here, as Maynard Shirley has asserted

an alibi defense.  See Defendant Maynard Shirley's Notice of Alibi, filed June 14, 2016 (Doc. 72).

The Court divides its discussion of the facts into four parts.  First, the Court will review the

events leading up to killing that occurred in the early morning of March 21, 2015.  Second, the Court

will discuss the circumstances and witness accounts of that killing.  Third, the Court will discuss the

search for Maynard Shirley and his two brothers in the aftermath of the killing.  Fourth, the Court

will discuss the circumstances of Maynard Shirley's arrest on March 25, 2015.

### 1.    Background.

Before the offense date of March 21, 2015, Maynard Shirley's brother, E. Shirley, and E.

Shirley's girlfriend, V. Jim, had been in a ten-year relationship.  See Amended Complaint ¶ 8, at 3-4.

Because of relationship problems, however, V. Jim left E. Shirley a week before the incident and

began an intimate relationship with B. BlueEyes, with whom E. Shirley had been close friends for

years.  See Amended Complaint ¶¶ 7-8, at 3-4.  V. Jim did not tell E. Shirley that she intended to

move in with B. BlueEyes.  See Amended Complaint ¶ 11, at 5.  According to V. Jim's mother, C.

Jim, V. Jim left E. Shirley "because he hit and choked her and [] she did not want to go back to him,

as she was afraid of him."  Amended Complaint ¶ 11, at 5-6.

Early in the morning of March 21, 2015, E. Shirley sent multiple text messages to C. Jim

inquiring about V. Jim's location.  See Amended Complaint ¶ 11, at 5.  C. Jim initially ignored these

messages, but, at 1:43 a.m., she responded that V. Jim was living with B. BlueEyes in Fruitland,

New Mexico, within the exterior boundaries of the Navajo Nation Indian Reservation, and that E. Shirley "needed to leave Valerie alone and let her move on with her life . . . ." Amended Complaint ¶ 11, at 5. E. Shirley told C. Jim that B. BlueEyes was his friend and that he was going to "kick his ass." Amended Complaint ¶ 11, at 5.

      2.    **The Homicide on March 21, 2015.**

Within an hour of speaking with C. Jim, E. Shirley and his brothers Maynard Shirley and Michael Shirley -- all enrolled members of the Navajo Nation, see Amended Complaint ¶ 18, at 11-12 -- drove to the BlueEyes' trailer home in Fruitland. See Amended Complaint ¶ 2, at 1. Upon arriving, the brothers forcibly entered the home while the BlueEyes family and V. Jim slept. See Amended Complaint ¶ 8, at 3. The brothers proceeded directly to B. BlueEyes' bedroom down the hall. See Amended Complaint ¶ 8, at 3. Upon hearing the noise and intrusion, B. BlueEyes stepped out of his bedroom and into the hallway, where the Shirley brothers immediately began stabbing him. See Amended Complaint ¶ 8, at 3. V. Jim followed and observed E. Shirley holding an unknown object in his hand, which he appeared to use to stab B. BlueEyes. See Amended Complaint ¶ 8, at 3.

Upon hearing the commotion, B. BlueEyes' father, Perry BlueEyes, woke up and stepped into the hallway, where he saw E. Shirley and B. BlueEyes fighting in the living room. See Amended Complaint ¶ 10, at 4. As P. BlueEyes proceeded down the hallway to assist his son, one of the Shirley brothers emerged and stabbed P. BlueEyes with a banana-shaped knife. See Amended Complaint ¶ 10, at 4; Preliminary Hearing Tr. at 14:23-24 (Cahoon). See also Preliminary Hearing Tr. at 13:7-14 (Cahoon)(stating that P. BlueEyes was "almost immediately . . . attacked and stabbed multiple times"). The stabbing persisted until V. Jim interceded and told the attacker to leave. See

Amended Complaint ¶ 10, at 4.  By that point, P. BlueEyes was seriously injured and could not assist B. BlueEyes.  See Amended Complaint ¶ 9, at 4.

Janet BlueEyes and Lakisha BlueEyes -- B. BlueEyes' mother and sister, respectively -- were sleeping in a bedroom on the opposite side of the residence when the Shirley brothers broke into the house on March 21, 2015.  See Amended Complaint ¶ 12, at 6.  When J. BlueEyes heard the commotion, she exited the bedroom and saw Maynard Shirley stabbing B. BlueEyes in the living room with a banana-shaped knife.  See Amended Complaint ¶ 12, at 6; Preliminary Hearing Tr. at 15:24-25, 16:1 (Cahoon).  As she approached, Maynard Shirley disengaged from stabbing B. BlueEyes and began threatening J. BlueEyes with the knife.  See Amended Complaint ¶ 12, at 6.  L. BlueEyes followed J. BlueEyes and observed Maynard Shirley threatening her mother with a banana-shaped knife.  See Amended Complaint ¶ 13, at 7.  When J. BlueEyes saw L. BlueEyes, she directed her to call 911.  See Amended Complaint ¶ 13, at 7.

During the commotion, one of the Shirley brothers exited the trailer to retrieve a flare gun, returned, and shot at P. BlueEyes between his legs as P. BlueEyes lay on the floor.  See Amended Complaint ¶ 12, at 6.  The three Shirley brothers then left the scene.  See Amended Complaint ¶ 12, at 6.  J. BlueEyes recalls that, in the subsequent confusion, V. Jim was on the ground, holding B. BlueEyes in her arms and crying, and repeatedly saying that "Maynard was the one who stabbed and killed [B. BlueEyes]."  Amended Complaint ¶ 12, at 7.

At 2:44 a.m., 911 dispatchers received a call from L. BlueEyes advising that her brother, B. BlueEyes, and father, P. BlueEyes, had been stabbed in their trailer home.  See Amended Complaint ¶ 2, at 1.  L. BlueEyes advised that there was a lot of blood and that the Shirley brothers had departed the scene.  See Amended Complaint ¶ 2, at 1.  Navajo Nation Police Officers Kurtis Halkani and Jo Donna Salt were promptly dispatched to the scene at 2:50 a.m.  See Amended

Complaint ¶ 3, at 1-2.  Shortly thereafter, at 3:06 a.m., a relative of B. BlueEyes and P. BlueEyes contacted the Shiprock New Mexico Police Department and "reported that someone had broken into said residence, beat up [B. BlueEyes], and that [B. BlueEyes] was not breathing."   Amended Complaint ¶ 4, at 2.

Halkani arrived on scene at approximately 3:09 a.m., followed shortly thereafter by Salt, who took position outside the residence to provide security.  See Amended Complaint ¶ 5, at 2.  Upon observing a blood-like substance on the deck area leading into the home and on the front door, Halkani entered the residence and found B. BlueEyes lying on the ground, soaked in blood.  See Amended Complaint ¶ 5, at 2; Preliminary Hearing Tr. at 8:17-21 (Cahoon).  V. Jim was on the ground embracing B. BlueEyes, crying and distraught.   See Amended Complaint ¶ 5, at 2. According to Halkani, B. BlueEyes had no pulse and had a large stab wound on his left upper chest area.  See Amended Complaint ¶ 5, at 2; Preliminary Hearing Tr. at 9:1-4 (Cahoon).  Halkani also observed P. BlueEyes nearby, bent over on the couch in the living room, with multiple stab wounds and covered in blood.  See Amended Complaint ¶ 5, at 2; Preliminary Hearing Tr. at 9:8-10 (Cahoon).   Blood appeared to be on the floor and walls of the hallway leading back to two bedrooms.  See Amended Complaint ¶ 5, at 2.

V. Jim told Halkani that she used to be in a relationship with E. Shirley, that all three brothers live in Kirtland, New Mexico, and that they drive a white BMW.  See Amended Complaint ¶ 7, at 3. See also Preliminary Hearing Tr. at 26:14-15 (Cahoon)(stating that Maynard Shirley owns the BMW).  V. Jim added that she had been in a relationship with B. BlueEyes for one month, see Amended Complaint ¶ 7, at 3, that she had recently lived with the Shirleys, and that E. Shirley was "tough" and a "bully," Amended Complaint ¶ 8, at 4.  She also relayed that Maynard Shirley had been in prison for a long time and that "she is scared of him."  Amended Complaint ¶ 8, at 4.

At 3:38 a.m., P. BlueEyes was rushed to San Juan Regional Medical Center for injuries he sustained while trying to protect B. BlueEyes.  See Amended Complaint ¶ 9, at 3.  As of March 25, 2015, P. BlueEyes was still being treated for a collapsed lung and multiple stab wounds.  See Amended Complaint ¶ 9, at 4.  In an interview at the hospital a couple days after the incident, P. BlueEyes, who is about five feet, eight inches tall, described his attacker as being as "just a tad bit smaller than him" and said that he was stabbed with a banana-shaped knife.  Preliminary Hearing Tr. at 14:18-24 (Cahoon).

### 3.    The Search for the Shirley Brothers.

Later in the day on March 21, 2015, Special Agent Cary S. Cahoon of the United States Department of Justice, Federal Bureau of Investigation, and Criminal Investigator Jefferson Joe of the Navajo Department of Criminal Investigations, commenced an effort to locate Maynard, Elijah, and Michael Shirley.  See Amended Complaint ¶ 14, at 8.  Cahoon and Joe met with the Shirley brothers' mother, Althea Shirley, who said that the Shirley brothers were at their home in Kirtland and that she had just come from there.  See Amended Complaint ¶ 14, at 8; Preliminary Hearing Tr. at 27:4-10 (Cahoon).  Cahoon and Joe instructed A. Shirley to go to the brothers' home, and relay that Cahoon and Joe needed to speak with them about the incident that occurred early that morning. See Amended Complaint ¶ 14, at 8.  When A. Shirley arrived, however, she discovered that Maynard Shirley and his fiancée, Arnelia Williams, had "completely cleaned out their room of their belongings and had left the house."  Amended Complaint ¶ 14, at 8.  E. Shirley also was not there; only Michael Shirley remained.  See Amended Complaint ¶ 14, at 8.

E. Shirley and Maynard Shirley had relocated to their grandmother's home and "sheep camp" thirty minutes outside of Farmington, New Mexico, on the Navajo Indian Reservation.  Res Gestae Motion at 8; Amended Complaint ¶ 15, at 9; Preliminary Hearing Tr. at 85:19 (Cahoon).  In their

absence, A. Shirley urged Michael Shirley to call and set up a time to meet with Cahoon and to discuss the incident.  See Amended Complaint ¶ 14, at 8.  Michael Shirley consented, and a meeting was set for 3:00 p.m. that day at the Criminal Investigations office in Shiprock, New Mexico.  See Amended Complaint ¶ 14, at 8.  On the telephone, Michael Shirley indicated that he would call ahead of the appointment to confirm that he could make it; however, Cahoon never received such confirmation, despite numerous attempts to contact Michael Shirley by telephone.  See Amended Complaint ¶ 14, at 8.  Cahoon was likewise unable to reach Michael Shirley the following day, March 22, 2015.  See Amended Complaint ¶ 14, at 9.

On March 23, 2015, Michael Shirley, A. Shirley, and other relatives traveled to the grandmother's house to urge E. Shirley and Maynard Shirley to surrender to law enforcement.  See Res Gestae Motion at 8; Amended Complaint ¶ 14, at 9.  E. Shirley agreed to surrender, but Maynard Shirley and Michael Shirley elected to remain at the house, see Res Gestae Motion at 8, stating that "they refused to meet with law enforcement,"  Amended Complaint ¶ 15, at 9.  See Preliminary Hearing Tr. at 32:3 (Cahoon)(stating that E. Shirley surrendered).  According to the relatives who were present, the Shirley brothers stated that "law enforcement could come and try to get them if they wanted."  Amended Complaint ¶ 15, at 9.  Maynard Shirley and Michael Shirley then began yelling at and getting angry with the relatives, causing them to leave the property out of "fear for their safety and the potential something bad could happen if law enforcement came and tried to arrest Michael and Maynard."  Amended Complaint ¶ 15, at 9.

E. Shirley was subsequently taken to the station at 4:00 p.m. on March 23, 2015, where he "acted as if it was the first time he heard about the incident involving [B. BlueEyes]."  Amended Complaint ¶ 15, at 9.  After some questioning, E. Shirley invoked his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and requested an attorney.  See Amended Complaint ¶ 15, at 9.

- 7 -

After E. Shirley left, Maynard Shirley, Michael Shirley, A. Williams, and other witnesses went to the "wash" by the grandmother's house where they had concealed Maynard Shirley's white BMW.  Res Gestae Motion at 8; Amended Complaint ¶ 15, at 9.  Together, they removed their belongings from the vehicle.  See Res Gestae Motion at 8.  Maynard Shirley and Michael Shirley then proceeded to wipe the vehicle down "to remove any latent prints[.]"  Res Gestae Motion at 8.  Finally, they "damaged the interior of the vehicle, broke out windows, and [] set the car on fire."  Res Gestae Motion at 8.

The following day, March 24, 2015, family members advised Joe that Maynard Shirley and Michael Shirley had burned the white BMW at their grandmother's house.  See Amended Complaint ¶ 16, at 10.  Law enforcement subsequently went to the property and found the burned BMW, yet Maynard Shirley and Michael Shirley were nowhere to be found.  See Amended Complaint ¶ 16, at 10.

### 4.      **Maynard Shirley's Arrest**.

On March 25, 2015, the Honorable B. Paul Briones, United States Magistrate Judge for the District of New Mexico, issued a warrant for Maynard Shirley's arrest.  See Arrest Warrant for Maynard Shirley at 1, filed March 25, 2015 (Doc. 2).  That day, the FBI received word that Maynard Shirley and A. Williams had travelled to Aztec, New Mexico, where they were staying at a cousin's trailer home.  See Preliminary Hearing Tr. at 37:2-5 (Mott, Cahoon).  Acting on this information, law enforcement agents/officers surrounded the residence.  See Preliminary Hearing Tr. at 37:12-21 (Cahoon).  After repeated knocks and unsuccessful attempts to make oral contact with either Maynard Shirley or A. Williams, the officials entered the residence with a key that the cousin provided.  See Preliminary Hearing Tr. at 37:19-21 (Cahoon).

Inside the residence, the officials found A. Williams in one of the trailer's bathrooms.  See Preliminary Hearing Tr. at 37:21-24 (Cahoon).  The officials inquired about Maynard Shirley's whereabouts, but A. Williams said that she did not know.  See Preliminary Hearing Tr. at 37:24-25 (Cahoon).  A. Williams was then detained while the officials cleared the rest of the residence.  See Preliminary Hearing Tr. at 38:1 (Cahoon).  As the officers cleared the back bedroom, they discovered Maynard Shirley concealed between a mattress and box spring of a bed in the room.  See Preliminary Hearing Tr. at 38:2-4 (Cahoon).  Maynard Shirley was armed with a knife.  See Preliminary Hearing Tr. at 38:4 (Cahoon).  In Cahoon's opinion, the knife looked like a hunting knife, not a banana knife as the witnesses to B. BlueEyes' killing described that weapon.  See Preliminary Hearing Tr. at 39:1-3 (Mott, Cahoon).  Maynard Shirley then was taken into custody. See Record of Arrest of Maynard Shirley at 1, entered March 27, 2015 (Doc. 8)([text-only-entry]).

Subsequent to Maynard Shirley's and A. Williams' arrest, law enforcement "obtained a warrant to search bags belonging to Mr. Shirley and his fiancée that we[re] found inside the home where they were arrested."  Defendant Maynard Shirley's Motion in Limine Regarding Possession of Knives and an Axe at 2, filed September 26, 2016 (Doc. 116)("Knives and Axe Motion").  Among these belongings were "several knives, including pocketknives and a Gerber knife, as well as an axe."[1]  Knives and Axe Motion at 2.

---

[1]The United States alleges that Maynard Shirley was in possession of a "Bear Gryllis [sic]" Gerber Knife and "Bear Gryllis [sic]" Gerber Axe.  See Knives and Axe Motion at 2.  At the hearing, the United States clarified that these items bear the eponymous name of "TV personality" and "survivalist," Bear Grylls.  Transcript of Exhibit Hearing (taken September 29, 2016) at 15:24-16:1 (Duncan).  The Court notes that the parties' briefings incorrectly refer to "Bear Gryllis," not "Bear Grylls" products.

## PROCEDURAL BACKGROUND

The United States commenced this action on March 25, 2015.  See Criminal Complaint at 1, filed March 25, 2015 (Doc. 1)("Complaint").  In the Complaint, the United States recites the foregoing facts, describes the Shirley brothers' physical characteristics according to government databases, and argues that the Shirley brothers match the descriptions provided by the witnesses who were present at the BlueEyes residence during the stabbing of B. BlueEyes and P. BlueEyes.  See Complaint ¶ 17, at 11.  Based on these allegations, the United States concludes that there was probable cause to charge E. Shirley, Maynard Shirley, and Michael Shirley with murder, aiding and abetting, and assault.  See Complaint ¶ 18, at 11-12.

The following evening, on March 26, 2015, Michael Shirley was arrested in Farmington.  See Preliminary Hearing Tr. at 40:13-18 (Cahoon).  At that point, all three Shirley brothers were in custody -- E. Shirley had surrendered on March 23, 2015, see Amended Complaint ¶ 15, at 9, and Maynard Shirley had been arrested on March 25, 2015, see Preliminary Hearing Tr. at 39:11-20 (Mott, Cahoon).

On April 14, 2015, a Grand Jury indicted E. Shirley, Maynard Shirley, and Michael Shirley on three counts: (i) unlawfully killing B. BlueEyes -- with a knife -- with malice aforethought in violation of 18 U.S.C. §§ 1153, 111, and 18 U.S.C. § 2; (ii) assaulting P. BlueEyes and causing serious bodily injury in violation of 18 U.S.C. §§ 1153, 113(a)(6), and 18 U.S.C. § 2; and (iii) assaulting P. BlueEyes with a dangerous weapon -- a knife -- with intent to inflict bodily harm in violation of 18 U.S.C. §§ 1153, 113(a)(3), and 18 U.S.C. § 2.  See Indictment at 1-2, filed April 14, 2015 (Doc. 25).  On February 25, 2016, the Court set trial for October 17, 2016.  See Order to Continue at 2, filed February 25, 2016 (Doc. 66).

- 10 -

On September 21, 2016, in proceedings before the Honorable William P. Lynch, United States Magistrate Judge for the District of New Mexico, Michael Shirley entered a guilty plea as to all three counts charged in the indictment.  See Clerk's Minutes for Plea Hearing held on 9/21/2016 at 1, entered September 23, 2016 (Doc. 109).  E. Shirley also pled guilty in the same proceedings. See Clerk's Minutes for Plea Hearing held on 9/21/2016 at 1, entered September 23, 2016 (Doc. 110).  Maynard Shirley is now the sole Defendant in the case.

The United States now moves to admit E. Shirley's statement to C. Jim, allegedly made early in the morning on March 21, 2015, that he was "going to kick his ass" in reference to B. BlueEyes. Motion at 2.  The United States seeks to introduce this statement "as a statement against penal interest under Fed. R. Evid. 804(b)(3)."  Motion at 1.  In the alternative, the United States argues that the Court should admit the statement "as an excited utterance under Fed. R. Evid. 803(2)."  Reply to Defendant Maynard Shirley's Response [Doc. 137] to United States' Motion *In Limine* to Permit Testimony of Unavailable Witness as a Statement Against Interest at 3, filed October 16, 2016 (Doc. 146)("Motion Reply").  In response, Maynard Shirley argues that the statement "is inadmissible hearsay and should not be admitted at trial."  Defendant Maynard Shirley's Response to United States' Motion In Limine to Permit Testimony of Unavailable Witness as a Statement Against Interest [Doc. 135] at 2, filed October 13, 2016 (Doc. 137)("Motion Response").

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  United States v. Christy, 2011 WL 5223024, at *5 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 802).  Under rule 801(c) of the Federal Rules of Evidence, "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c). Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to

introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999)(Carnes, J.). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)(Hartz, J.)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay."). Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. A party opponent's statement is excluded from the definition of hearsay where:

> The statement is offered against an opposing party and:
>
>> **(A)** was made by the party in an individual or representative capacity;
>>
>> **(B)** is one the party manifested that it adopted or believed to be true;
>>
>> **(C)** was made by a person whom the party authorized to make a statement on the subject;
>>
>> **(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
>>
>> **(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2). The United States Court of Appeals for the Tenth Circuit has stated:

> Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. No guarantee of trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from restrictive influences of the opinion rule and the rule requiring first-hand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for a generous treatment of this avenue of admissibility.

- 12 -

Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 667 (10th Cir. 2006)(Seymour, J.)(internal quotation marks and alterations omitted).[2]

## LAW REGARDING RULE 803(2)

Rule 803(2), commonly referred to as the excited utterance exception, provides an exception to the exclusion of hearsay statements for "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). The United States Court of Appeals for the District of Columbia has noted that "[t]he rationale underlying the 'excited utterance' exception is that 'excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self interest and therefore rendered unreliable.'" United States v. Alexander, 331 F.3d 116, 122 (D.D.C. 2003)(quoting United States v. Brown, 254 F.3d 454, 458 (3d Cir. 2001)). "Thus, to qualify as an excited utterance, the declarant's state of mind at the time that the statement was made must preclude conscious reflection on the subject of the statement." United States v. Alexander, 331 F.3d at 122 (quoting United States v. Joy, 192 F.3d 761, 766 (7th Cir. 1999))(internal quotations and changes omitted). The Tenth Circuit, in United States v. Smith, 606

---

[2]The 2011 restyling of the Federal Rules removed "admissions" from the language of rule 801(d) of the Federal Rules of Evidence, and uses instead the term "statements." Fed. R. Evid. 801(d). This replacement was purposeful: "The term 'admissions' is confusing because not all statements covered by the exclusion are admissions in the colloquial sense -- a statement can be within the exclusion even if it 'admitted' nothing and was not against the party's interest when made." Fed. R. Evid. 801, advisory committee's note on 2011 Amendments.

Although the advisory committee made the commentary quoted in the text regarding the trustworthiness of "admissions by a party-opponent" before the 2011 amendments to the Federal Rules of Evidence, the analysis should not be different under the new 2011 restyling of the rules. Because the advisory committee's purpose for the 2011 restyling was to make the rules "more easily understood and to make style and terminology consistent through the rules," and there was no "intent to change any result in any ruling on evidence admissibility," the analysis applied before 2011 should still be useful for cases after the restyling. Fed. R. Evid. 801.

F.3d 1270 (10th Cir. 2010), set forth a district court's required analysis for whether a statement is

admissible under the excited utterance exception:

> The so-called excited-utterance exception has three requirements: (1) a startling
> event; (2) the statement was made while the declarant was under the stress of the
> event's excitement; and (3) a nexus between the content of the statement and the
> event.  There is no precise amount of time between the event and the statement
> beyond which the statement cannot qualify as an excited utterance.  Admissibility
> hinges on a statement's contemporaneousness with the excitement a startling event
> causes, not the event itself.  There is no hard time limit that must be met under Rule
> 803; what is relevant is whether the declarant is still under the excitement of the
> startling event.

606 F.3d at 1279 (citations and internal quotation marks omitted).  The Tenth Circuit has noted:

> Courts consider a range of factors in determining whether a declarant made a
> statement while under the stress of a particular event.  Among the more relevant
> factors are: the amount of time between the event and the statement; the nature of
> the event; the subject matter of the statement; the age and condition of the declarant; the
> presence or absence of self-interest; and whether the statement was volunteered or in
> response to questioning.

United States v. Pursley, 577 F.3d 1204, 1220 (10th Cir. 2009).  "Permissible subject matter of the

statement is [not] limited . . . to description or explanation of the event or condition . . . .  [T]he

statement need only relate to the startling event or condition, thus affording a broader scope of

subject matter coverage."  United States v. Frost, 684 F.3d 963, 973 (10th Cir. 2012)(first brackets in

original)(quoting Fed. R. Evid. 803 Advisory Comm. Notes).  "If the trial court has access to a

recording of the declarant's statement, it may also consider the declarant's 'tone and tenor of voice'

in determining whether the declarant made that statement while under the stress of excitement."

United States v. Alexander, 331 F.3d at 123 (quoting United States v. Woodfolk, 656 A.2d 1145,

1151 n.16 (D.C. 1995)(collecting cases)).

The United States Court of Appeals for the Second Circuit has provided an analysis of the

similarities and subtle differences between the present sense impression and excited utterance

exceptions to the rule against hearsay:

As defined by the Federal Rules of Evidence, a present sense impression is a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Rule 803(1), Fed. R. Evid.   Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory.  See United States v. Brewer, 36 F.3d 266, 272 (2d Cir. 1994).

The hearsay exception for excited utterances is premised on a similar, though distinct, assumption that the reliability of a statement increases as opportunity for reflection by the declarant decreases.  An "excited utterance" is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Rule 803(2), Fed. R. Evid. As we have explained, "[t]he rationale for this hearsay exception is that the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability." [United States v.] Tocco, 135 F.3d [] [116,] 127[ (2d Cir. 1998)].  Unlike present sense impressions, "[a]n excited utterance need not be contemporaneous with the startling event to be admissible." Id.  Rather "[t]he length of time between the event and the utterance is only one factor to be taken into account in determining whether the declarant was, within the meaning of rule 803(2), 'under the stress of excitement caused by the event or condition.'"  United States v. Scarpa, 913 F.2d 993, 1017 (2d Cir. 1990).

. . . .

Thus while the hearsay exception for present sense impressions focuses on contemporaneity as the guarantor of reliability, and requires that the hearsay statement "describe or explain" the contemporaneous event or condition, Rule 803(1), Fed. R. Evid., the excited utterance exception is based on the psychological impact of the event itself, and permits admission of a broader range of hearsay statements -- i.e. those that "relate to" the event.  Rule 803(2), Fed. R. Evid.

United States v. Jones, 299 F.3d 103, 112 & n.3 (2d Cir. 2002).

In Maples v. Vollmer, 2013 WL 1681234 (D.N.M. 2013)(Browning, J.), the plaintiff's "then-boyfriend's daughter" called 911; in response, the defendant officers arrived at the plaintiff's residence.  2013 WL 1681234, at *1.  The plaintiff was in his front yard when the officers arrived; when he tried to walk away from them, the officers chased the plaintiff, who then fled from the officers.  See 2013 WL 1681234, at *1.  The officers tackled the plaintiff when they caught up to him, and the plaintiff alleged that the officers used excessive and unnecessary force.  See 2013 WL

- 15 -

1681234, at *1.  The plaintiff filed a motion in limine, asking the Court to prohibit the defendants or their witnesses from disclosing the contents of the 911 call.  See 2013 WL 1681234, at *2.  The Court concluded that the call was admissible under rule 803(2), noting that it satisfied the three requirements of the excited-utterance exception to the rule against hearsay:

> The second and third requirements of the excited utterance analysis cannot reasonably be challenged under the circumstances surrounding S. Lane's 911 call: (i) S. Lane's statements were contemporaneous with the event, and there is thus no lapse of time here between the startling event to which S. Lane's statements relate and the statements; and (ii) there is a nexus between the statements' content and the event, as S. Lane's statements detail the event in real time, explain why the event prompted her to call 911, and describe Maples to the 911 operator.

2013 WL 1681234, at *16.  The remaining issue was whether the event to which they relate -- the plaintiff's "attempt to allegedly wrongfully gain access" to his residence and his "coming after" the caller's father -- was "a startling event or condition."  2013 WL 1681234, at *16.

> Professor Stephen A. Saltzburg explains that courts have been quite liberal in finding that an event is startling for purposes of rule 803(1):
>
>> In most cases it is not seriously disputed that the event to which the excited utterance relates is in fact a startling event. Occurrences such as accidents, fights, and physical crimes are generally deemed startling events. However, admissibility under the Rule is not limited to events describing such clearly upsetting occurrences. The Courts have been quite expansive in finding that an event triggered a startled statement is in fact a startling event.
>
> 4 Stephen A. Saltzburg, Michael M. Martin & Daniel J. Capra, Fed. Rules of Evid. Manual § 803.02[3][b], at 803-18 (9th ed. 2006)(footnotes omitted).  Professor Saltzburg cites to David v. Pueblo Supermarket, 740 F.2d 230 (3d Cir. 1984), as an "e.g." example to support his proposition that courts have been quite expansive in finding a startling event.  In David v. Pueblo Supermarket, the United States Court of Appeals for the Third Circuit held that a woman observing another woman, to whom she was not related, "who was eight months pregnant fall directly on her stomach . . . would reasonably qualify as a 'startling occasion.'"  740 F.2d at 235.  Another example to which Professor Saltzburg cites is United States v. Beverly, 369 F.3d 516 (6th Cir. 2006), in which the United States Court of Appeals for the Sixth Circuit held that "viewing the photograph of the individual that [the declarant] recognized as her husband committing a bank robbery was a startling event."  369 F.3d at 540.

2013 WL 1681234, at *16.  The Court noted that the caller believed that the plaintiff was not supposed to be at his residence, "he had left the hospital when he should not have, that she was 'pretty sure' he was in the hospital because he was suicidal, and that she believed [the plaintiff] was at the residence because he was coming after her father," concluding that "[t]hese events are at least as startling as observing an unrelated person, even a pregnant person, slip in a grocery store."  2013 WL 1681234, at *16.

## ANALYSIS

Hearsay evidence is generally inadmissible "because it is considered unreliable."  United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)(citing Williamson v. United States, 512 U.S. 594, 598 (1994)).  See Fed. R. Evid. 801(c) (defining hearsay as an out-of-court statement offered "to prove the truth of the matter asserted in the statement").  The hearsay rule is subject, however, to several exceptions.  Under rule 804(b)(3)(A), an out-of-court statement is admissible if the declarant is unavailable to testify, and the statement is "against the declarant's proprietary, pecuniary, or penal interest."  United States v. Lozado, 776 F.3d at 1125 (citing Williamson v. United States, 512 U.S. at 599-600).  A statement against interest is one that "a reasonable person in the declarant's position would have made only if the person believed it to be true."  Fed. R. Evid. 804(b)(3)(A).  Moreover, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness."  Fed. R. Evid. 804(b)(3)(B).

The United States argues that E. Shirley's alleged statement to C. Jim -- that he was "going to go kick [B. BlueEyes'] ass" -- is admissible as a statement against E. Shirley's penal interest.  Motion at 2.  The United States reasons that, to qualify for the hearsay exception under rule 804(b)(3)(A), a statement must simply "implicate a criminal act or provide significant details of a criminal act."  Motion Reply at 1 (citing Williamson v. United States, 512 U.S. at 604).  Here, the

United States contends that E. Shirley's statement was inculpating, because it exposed him "to a greater risk of criminal liability" and shows his "intent to do the crime."  Motion Reply at 1.  The United States also contends that E. Shirley's statement "provides a motive for the crime" and shows his "intent to harm Brandon BlueEyes;" in the United States' view, "[a] reasonable person in the position of Elijah Shirley would not have made the statement unless they believed it to be true and they intended to commit the act."  Motion Reply at 1 (citing United States v. Lozado, 776 F.3d at 1130).

The Court disagrees with the United States.  "'To be admissible under Rule 804(b)(3), a statement against penal interest must so far tend to subject the declarant to criminal liability that a reasonable man in his position would not have made the statement unless he believed it to be true.'" United States v. Lozado, 776 F.3d at 1125 (quoting United States v. Chalan, 812 F.2d 1302, 1311 (10th Cir. 1987)).  The United States is correct that the statement itself "does not have to be a criminal act."  Motion Reply at 1.  For example, in Williamson v. United States the Supreme Court of the United States of America held that the defendant's statement admitting his possession of cocaine in a suitcase was "clearly" admissible under rule 804(b)(3).  512 U.S. at 604.  Nevertheless, to be a statement against interest, the statement must have a strong tendency to "subject the declarant to criminal liability[.]"  United States v. Lozado, 776 F.3d at 1125 (citation omitted).  Here, the statement at issue -- "I'm going to kick his ass" -- does not have a strong tendency to subject E. Shirley to criminal liability.  The Court agrees with Maynard Shirley that "[i]t is not a crime to become angry that your significant other has been unfaithful, to express that anger, or even to intend to 'kick [someone's] ass.'"  Motion Response at 2 (alterations in original).  In Williamson v. United States, the defendant's statement that there was cocaine in the suitcase was against his penal interest, because he thereby "essentially forfeited his only possible defense to a charge of cocaine possession,

lack of knowledge," 512 U.S. at 604; here, however, E. Shirley's statement was simply an expression of frustration, which -- by itself -- implicates nothing criminal.  Had E. Shirley said he already kicked B. BlueEyes' ass, that statement would have been against his penal interests; a future statement, by contrast, goes more toward intent or motive.

Moreover, rule 804(b)(3)(B) requires that the context and circumstances under which the proffered statement against penal interest is made "clearly indicate its trustworthiness."  Fed. R. Evid. 804(b)(3)(B).   The Tenth Circuit has provided that a "statement lacks circumstantial guarantees of trustworthiness" unless a reasonable person would be "aware[] that the statement could have adverse consequences[.]"  United States v. Lozado, 776 F.3d at 1125.  Here, the circumstances do not suggest that a reasonable person would be aware that declaring "I'm going to kick his ass" would adversely affect the speaker's penal interests.  Awareness of adverse consequences to one's penal interests, of course, requires that such penal interests exist at the time the statement is made. In other words, unless the harm is concomitant with the utterance of the statement, the risk of that harm could have no influence on the declarant to speak truthfully, and thus, there could be no circumstantial guarantees of trustworthiness.  See Fed. R. Evid. 804 advisory committee notes (stating that the rationale for this hearsay exception is "the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true").  In this case, E. Shirley's alleged statement preceded the alleged murder on March 21, 2015, and was made in a different location.  See Amended Criminal Complaint ¶ 11, at 5, filed March 25, 2015 (Doc. 4)("Amended Complaint").  Accordingly, E. Shirley could not have been aware of the adverse consequences of the statement to his penal interests, because his penal interests were not yet implicated.

The United States argues, in the alternative, that the Court should admit E. Shirley's alleged statement "as an excited utterance under Fed. R. Evid. 803(2)." Motion Reply at 3. The United States argues that the statement was "Elijah Shirley's immediate response upon finding out troubling news," that it was his "instinctive reaction to the stressor," and that he "was still under the stress of excitement it caused when he made the statement." Motion Reply at 3.

This line of argumentation is likewise unpersuasive. The Tenth Circuit has stated that the "excited-utterance" exception to the rule against hearsay "'has three requirements: (1) a startling event; (2) the statement was made while the declarant was under the stress of the event's excitement; and (3) a nexus between the content of the statement and the event.'" United States v. Smith, 606 F.3d at 1279 (quoting United States v. Pursley, 577 F.3d at 1220). The Tenth Circuit considers a range of factors in determining whether a "startling event" occurred, such as the event's nature, the declarant's age and condition, and whether the declarant has any self-interest. See United States v. Pursley, 577 F.3d at 1220. A common example of a startling event is where the declarant is the victim of a crime. See United States v. Pursley, 577 at 1221 (holding that a "brutal assault" was a "startling event"); United States v. Smith, 606 F.3d at 1279 (holding that a "sexual assault" was a "startling event"); United States v. Ledford, 443 F.3d 702, 710 (10th Cir. 2005)(finding that a "domestic altercation," culminating in a death threat, "was clearly a startling event"). Moreover, "there is no precise amount of time between the event and the statement beyond which the statement cannot qualify as an excited utterance." United States v. Ledford, 443 F.3d at 711. Rather, "[a]dmissibility hinges on a statement's contemporaneousness with the excitement a startling event causes, not the event itself." United States v. Smith, 606 F.3d at 1279 (citing United States v. Pursley, 577 F.3d at 1221-22).

- 20 -

Here, the Court concludes that E. Shirley's alleged statement -- that he was "going to go kick [B. BlueEyes'] ass" -- does not qualify as an "excited utterance" under rule 803(2). Although potentially upsetting, news that E. Shirley's ex-girlfriend, V. Jim, was living with B. BlueEyes does not rise to the level of "startling" under rule 803(2). A "startling event" is something more exciting and stressful -- frequently, it involves a physical altercation. United States v. Pursley, 577 at 1221 ("brutal assault"); United States v. Smith, 606 F.3d at 1279 ("sexual assault"); United States v. Ledford, 443 F.3d at 710 ("domestic altercation"). A death threat can qualify as a "startling event," depending on the circumstances. United States v. Ledford, 443 F.3d at 710 (holding that a death threat contingent upon the victim calling the police was a startling event, and that the victim's recitation of that threat when actually calling the police was an excited utterance). Here, news that V. Jim had begun a new relationship -- even with a friend, see Amended Complaint ¶¶ 7-8, at 3-4 -- does not approach the level of excitement and stress that the Tenth Circuit's cases, referenced supra, have required. Here there was neither an altercation nor anything approaching a threat to E. Shirley. Further, E. Shirley and V. Jim had already been separated for a week when E. Shirley made the alleged statement. See Amended Complaint ¶¶ 7 and 8, at 3-4. At a minimum, news that V. Jim was living with another man was only somewhat surprising at that point, because she and E. Shirley were no longer together. The news was more upsetting than exciting. Thus, E. Shirley's statement does not qualify under the "excited utterance" exception to the hearsay rule, because a sufficiently startling event did not trigger it.

**IT IS ORDERED** that the United States Motion *In Limine* to Permit Testimony of Unavailable Witness As a Statement Against Interest, filed October 12, 2016 (Doc. 135), is denied.

UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
  United States Attorney
Linda Mott
Niki Tapia-Brito
Nicholas James Marshall
  Assistant United States Attorneys
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*


Mary (Molly) E. Schmidt-Nowara
Garcia Ives Nowara
Albuquerque, New Mexico

-- and --

Theresa M. Duncan
Albuquerque, New Mexico

     *Attorneys for Defendant Maynard Shirley*