**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                             No. CR 15-1285 JB

ELIJAH SHIRLEY;
MAYNARD SHIRLEY and
MICHAEL SHIRLEY

    Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the United States' Reply to Defendant's Response to United States Motion in Limine to Admit Defendant's Statements Made During Flight, Shirley and Statements by Althea Shirley for their Effect Upon the Listener , filed October 16, 2016 (Doc. 147)("Motion Reply"). The Court held a hearing on October 17, 2016. The primary issue is whether the Court should admit Defendant Maynard Shirley's statement, allegedly made to Janet BlueEyes at the BlueEyes' residence during the commission of the charged offense on March 21, 2015, to "[s]tay back, lady, or else I'm going to stab you." Motion Reply at 6.[1] The Court will admit the statement once the United States demonstrates, by a preponderance of the evidence, that Maynard Shirley made the statement.

---

[1] On October 11, 2016, Plaintiff United States of America moved to admit a number of Maynard Shirley's statements. See United States' Motion in Limine to Admit Defendant's Statements Made During Flight, Shirley and Statements by Althea Shirley for their Effect Upon the Listener, filed October 11, 2016 (Doc. 131)("Motion"). The United States lists twenty-three statements it seeks to admit. See Motion at 2-7. The United States does not, however, discuss Maynard Shirley's statement, "[s]tay back, lady, or else I'm going to stab you," in the Motion; it lists the statement in only the Motion Reply. Motion Reply at 6. Accordingly, the Court's analysis of the United States' arguments concerning the proffered statement is limited to those it made in the Motion Reply and at the hearing on the Motion.

## **FACTUAL BACKGROUND**

The Court takes its facts primarily from: (i) the Amended Criminal Complaint, filed March 25, 2015 (Doc. 4)("Amended Complaint"); (ii) the Transcript of Preliminary/Detention Hearing held on March 30, 2015, filed May 6, 2015 (Doc. 36)("Preliminary Hearing Tr."); and (iii) the United States' Motion *In Limine* to Admit Evidence [sic] *Res Gestae* Evidence Not Charged in the Indictment Pursuant to Federal Rules of Evidence 401, 403, 404(B), filed August 29, 2016 (Doc. 77)("Res Gestae Motion"). The Court relies on these factual accounts for background purposes only, as Maynard Shirley is presumed innocent until proven guilty at trial. This presumption of innocence, which is always important, is especially important here, as Maynard Shirley has asserted an alibi defense. See Defendant Maynard Shirley's Notice of Alibi, filed June 14, 2016 (Doc. 72).

The Court divides its discussion of the facts into four parts. First, the Court will review the events leading up to killing that occurred in the early morning of March 21, 2015. Second, the Court will discuss the circumstances and witness accounts of that killing. Third, the Court will discuss the search for Maynard Shirley and his two brothers in the aftermath of the killing. Fourth, the Court will discuss the circumstances of Maynard Shirley's arrest on March 25, 2015.

   1.   **Background.**

Before the offense date of March 21, 2015, Maynard Shirley's brother, Defendant Elijah Shirley, and E. Shirley's girlfriend, Valerie Jim, had been in a ten-year relationship. See Amended Complaint ¶ 8, at 3-4. Because of relationship difficulties, however, V. Jim left E. Shirley a week before the incident and began a relationship with Brandon BlueEyes, with whom E. Shirley had been close friends for years. See Amended Complaint ¶¶ 7-8, at 3-4. V. Jim did not tell E. Shirley that she intended to move in with B. BlueEyes. See Amended Complaint ¶ 11, at 5. According to V.

Jim's mother, Cornelia Jim, V. Jim left E. Shirley "because he hit and choked her and [] she did not want to go back to him, as she was afraid of him." Amended Complaint ¶ 11, at 5-6.

Early in the morning of March 21, 2015, E. Shirley sent multiple text messages to C. Jim inquiring about V. Jim's location. See Amended Complaint ¶ 11, at 5. C. Jim initially ignored these messages, but, at 1:43 a.m., she responded that V. Jim was living with B. BlueEyes in Fruitland, New Mexico, within the exterior boundaries of the Navajo Nation Indian Reservation, and that E. Shirley "needed to leave Valerie alone and let her move on with her life . . . ." Amended Complaint ¶ 11, at 5. E. Shirley told C. Jim that B. BlueEyes was his friend and that he was going to "kick his ass." Amended Complaint ¶ 11, at 5.

### 2. **The Homicide on March 21, 2015.**

Within an hour of speaking with C. Jim, E. Shirley and his brothers Maynard Shirley and Michael Shirley -- all enrolled members of the Navajo Nation, see Amended Complaint ¶ 18, at 11-12 -- drove to the BlueEyes' trailer home in Fruitland. See Amended Complaint ¶ 2, at 1. Upon arriving, the brothers forcibly entered the home while the BlueEyes family and V. Jim slept. See Amended Complaint ¶ 8, at 3. The brothers proceeded directly to B. BlueEyes' bedroom down the hall. See Amended Complaint ¶ 8, at 3. Upon hearing the noise and intrusion, B. BlueEyes stepped out of his bedroom and into the hallway, where the Shirley brothers immediately began stabbing him. See Amended Complaint ¶ 8, at 3. V. Jim followed and observed E. Shirley holding an unknown object in his hand, which he appeared to use to stab B. BlueEyes. See Amended Complaint ¶ 8, at 3.

Upon hearing the commotion, B. BlueEyes' father, Perry BlueEyes, woke up and stepped into the hallway, where he saw E. Shirley and B. BlueEyes fighting in the living room. See Amended Complaint ¶ 10, at 4. As P. BlueEyes proceeded down the hallway to assist his son, one

of the Shirley brothers emerged and stabbed P. BlueEyes with a banana-shaped knife. See Amended Complaint ¶ 10, at 4; Preliminary Hearing Tr. at 14:23-24 (Cahoon). See also Preliminary Hearing Tr. at 13:7-14 (Cahoon)(stating that P. BlueEyes was "almost immediately . . . attacked and stabbed multiple times"). The stabbing persisted until V. Jim interceded and told the attacker to leave. See Amended Complaint ¶ 10, at 4. By that point, P. BlueEyes was seriously injured and could not assist B. BlueEyes. See Amended Complaint ¶ 9, at 4.

J. BlueEyes and Lakisha BlueEyes -- B. BlueEyes' mother and sister, respectively -- were sleeping in a bedroom on the opposite side of the residence when the Shirley brothers broke into the house on March 21, 2015. See Amended Complaint ¶ 12, at 6. When J. BlueEyes heard the commotion, she exited the bedroom and saw Maynard Shirley stabbing B. BlueEyes in the living room with a banana-shaped knife. See Amended Complaint ¶ 12, at 6; Preliminary Hearing Tr. at 15:24-25, 16:1 (Cahoon). As she approached, Maynard Shirley disengaged from stabbing B. BlueEyes and began threatening J. BlueEyes with the knife, saying: "Stay back, lady, or else I'm going to stab you." Amended Complaint ¶ 12, at 6. L. BlueEyes followed J. BlueEyes and observed Maynard Shirley threatening her mother with a banana-shaped knife. See Amended Complaint ¶ 13, at 7. When J. BlueEyes saw L. BlueEyes, she directed her to call 911. See Amended Complaint ¶ 13, at 7.

During the commotion, one of the Shirley brothers exited the trailer to retrieve a flare gun, returned, and shot at P. BlueEyes between his legs as P. BlueEyes lay on the floor. See Amended Complaint ¶ 12, at 6. The three Shirley brothers then left the scene. See Amended Complaint ¶ 12, at 6. J. BlueEyes recalls that, in the subsequent confusion, V. Jim was on the ground, holding B. BlueEyes in her arms and crying, and repeatedly saying that "Maynard was the one who stabbed and killed [B. BlueEyes]." Amended Complaint ¶ 12, at 7.

At 2:44 a.m., 911 dispatchers received a call from L. BlueEyes advising that her brother, B. BlueEyes, and father, P. BlueEyes, had been stabbed in their trailer home. See Amended Complaint ¶ 2, at 1.  L. BlueEyes advised that there was a lot of blood and that the Shirley brothers had departed the scene.  See Amended Complaint ¶ 2, at 1.  Navajo Nation Police Officers Kurtis Halkani and Jo Donna Salt were promptly dispatched to the scene at 2:50 a.m.  See Amended Complaint ¶ 3, at 1-2.  Shortly thereafter, at 3:06 a.m., a relative of B. BlueEyes and P. BlueEyes contacted the Shiprock New Mexico Police Department and "reported that someone had broken into said residence, beat up [B. BlueEyes], and that [B. BlueEyes] was not breathing."  Amended Complaint ¶ 4, at 2.

Halkani arrived on scene at approximately 3:09 a.m., followed shortly thereafter by Salt, who took position outside the residence to provide security.  See Amended Complaint ¶ 5, at 2.  Upon observing a blood-like substance on the deck area leading into the home and on the front door, Halkani entered the residence and found B. BlueEyes lying on the ground, soaked in blood.  See Amended Complaint ¶ 5, at 2; Preliminary Hearing Tr. at 8:17-21 (Cahoon).  V. Jim was on the ground embracing B. BlueEyes, crying and distraught.  See Amended Complaint ¶ 5, at 2.  According to Halkani, B. BlueEyes had no pulse and had a large stab wound on his left upper chest area.  See Amended Complaint ¶ 5, at 2; Preliminary Hearing Tr. at 9:1-4 (Cahoon).  Halkani also observed P. BlueEyes nearby, bent over on the couch in the living room, with multiple stab wounds and covered in blood.  See Amended Complaint ¶ 5, at 2; Preliminary Hearing Tr. at 9:8-10 (Cahoon).  Blood appeared to be on the floor and walls of the hallway leading back to two bedrooms.  See Amended Complaint ¶ 5, at 2.

V. Jim told Halkani that she used to be in a relationship with E. Shirley, that all three brothers live in Kirtland, New Mexico, and that they drive a white BMW.  See Amended Complaint ¶ 7, at 3.

See also Preliminary Hearing Tr. at 26:14-15 (Cahoon)(stating that Maynard Shirley owns the BMW). V. Jim added that she had been in a relationship with B. BlueEyes for one month, see Amended Complaint ¶ 7, at 3, that she had recently lived with the Shirleys, and that E. Shirley was "tough" and a "bully," Amended Complaint ¶ 8, at 4. She also relayed that Maynard Shirley had been in prison for a long time and that "she is scared of him." Amended Complaint ¶ 8, at 4.

At 3:38 a.m., P. BlueEyes was rushed to San Juan Regional Medical Center for injuries he sustained while trying to protect B. BlueEyes. See Amended Complaint ¶ 9, at 3. As of March 25, 2015, P. BlueEyes was still being treated for a collapsed lung and multiple stab wounds. See Amended Complaint ¶ 9, at 4. In an interview at the hospital a couple days after the incident, P. BlueEyes, who is about five feet, eight inches tall, described his attacker as being as "just a tad bit smaller than him" and said that he was stabbed with a banana-shaped knife. Preliminary Hearing Tr. at 14:18-24 (Cahoon).

### 3. The Search for the Shirley Brothers.

Later in the day on March 21, 2015, Special Agent Cary S. Cahoon of the United States Department of Justice, Federal Bureau of Investigation, and Criminal Investigator Jefferson Joe of the Navajo Department of Criminal Investigations, commenced an effort to locate Maynard, Elijah, and Michael Shirley. See Amended Complaint ¶ 14, at 8. Cahoon and Joe met with the Shirley brothers' mother, Althea Shirley, who said that the Shirley brothers were at their home in Kirtland and that she had just come from there. See Amended Complaint ¶ 14, at 8; Preliminary Hearing Tr. at 27:4-10 (Cahoon). Cahoon and Joe instructed A. Shirley to go to the brothers' home, and relay that Cahoon and Joe needed to speak with them about the incident that occurred early that morning. See Amended Complaint ¶ 14, at 8. When A. Shirley arrived, however, she discovered that Maynard Shirley and his fiancée, Arnelia Williams, had "completely cleaned out their room of their

belongings and had left the house." Amended Complaint ¶ 14, at 8. E. Shirley also was not there; only Michael Shirley remained. See Amended Complaint ¶ 14, at 8.

E. Shirley and Maynard Shirley had relocated to their grandmother's home and "sheep camp" thirty minutes outside of Farmington, New Mexico, on the Navajo Indian Reservation. Res Gestae Motion at 8; Amended Complaint ¶ 15, at 9; Preliminary Hearing Tr. at 85:19 (Cahoon). In their absence, A. Shirley urged Michael Shirley to call and set up a time to meet with Cahoon and to discuss the incident. See Amended Complaint ¶ 14, at 8. Michael Shirley consented, and a meeting was set for 3:00 p.m. that day at the Criminal Investigations office in Shiprock, New Mexico. See Amended Complaint ¶ 14, at 8. On the telephone, Michael Shirley indicated that he would call ahead of the appointment to confirm that he could make it; however, Cahoon never received such confirmation, despite numerous attempts to contact Michael Shirley by telephone. See Amended Complaint ¶ 14, at 8. Cahoon was likewise unable to reach Michael Shirley the following day, March 22, 2015. See Amended Complaint ¶ 14, at 9.

On March 23, 2015, Michael Shirley, A. Shirley, and other relatives traveled to the grandmother's house to urge E. Shirley and Maynard Shirley to surrender to law enforcement. See Res Gestae Motion at 8; Amended Complaint ¶ 14, at 9. E. Shirley agreed to surrender, but Maynard Shirley and Michael Shirley elected to remain at the house, see Res Gestae Motion at 8, stating that "they refused to meet with law enforcement," Amended Complaint ¶ 15, at 9. See Preliminary Hearing Tr. at 32:3 (Cahoon)(stating that E. Shirley surrendered). According to the relatives who were present, the Shirley brothers stated that "law enforcement could come and try to get them if they wanted." Amended Complaint ¶ 15, at 9. Maynard Shirley and Michael Shirley then began yelling at and getting angry with the relatives, causing them to leave the property out of

"fear for their safety and the potential something bad could happen if law enforcement came and tried to arrest Michael and Maynard." Amended Complaint ¶ 15, at 9.

E. Shirley was subsequently taken to the station at 4:00 p.m. on March 23, 2015, where he "acted as if it was the first time he heard about the incident involving [B. BlueEyes]." Amended Complaint ¶ 15, at 9. After some questioning, E. Shirley invoked his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and requested an attorney. See Amended Complaint ¶ 15, at 9.

After E. Shirley left, Maynard Shirley, Michael Shirley, A. Williams, and other witnesses went to the "wash" by the grandmother's house where they had concealed Maynard Shirley's white BMW. Res Gestae Motion at 8; Amended Complaint ¶ 15, at 9. Together, they removed their belongings from the vehicle. See Res Gestae Motion at 8. Maynard Shirley and Michael Shirley then proceeded to wipe the vehicle down "to remove any latent prints[.]" Res Gestae Motion at 8. Finally, they "damaged the interior of the vehicle, broke out windows, and [] set the car on fire." Res Gestae Motion at 8.

The following day, March 24, 2015, family members advised Joe that Maynard Shirley and Michael Shirley had burned the white BMW at their grandmother's house. See Amended Complaint ¶ 16, at 10. Law enforcement subsequently went to the property and found the burned BMW, yet Maynard Shirley and Michael Shirley were nowhere to be found. See Amended Complaint ¶ 16, at 10.

### 4. **Maynard Shirley's Arrest.**

On March 25, 2015, the Honorable B. Paul Briones, United States Magistrate Judge for the District of New Mexico, issued a warrant for Maynard Shirley's arrest. See Arrest Warrant for Maynard Shirley at 1, filed March 25, 2015 (Doc. 2). That day, the FBI received word that Maynard Shirley and A. Williams had travelled to Aztec, New Mexico, where they were staying at a cousin's

trailer home.  See Preliminary Hearing Tr. at 37:2-5 (Mott, Cahoon).  Acting on this information, law enforcement agents/officers surrounded the residence.  See Preliminary Hearing Tr. at 37:12-21 (Cahoon).  After repeated knocks and unsuccessful attempts to make oral contact with either Maynard Shirley or A. Williams, the officials entered the residence with a key that the cousin provided.  See Preliminary Hearing Tr. at 37:19-21 (Cahoon).

Inside the residence, the officials found A. Williams in one of the trailer's bathrooms.  See Preliminary Hearing Tr. at 37:21-24 (Cahoon).  The officials inquired about Maynard Shirley's whereabouts, but A. Williams said that she did not know.  See Preliminary Hearing Tr. at 37:24-25 (Cahoon).  A. Williams was then detained while the officials cleared the rest of the residence.  See Preliminary Hearing Tr. at 38:1 (Cahoon).  As the officers cleared the back bedroom, they discovered Maynard Shirley concealed between a mattress and box spring of a bed in the room.  See Preliminary Hearing Tr. at 38:2-4 (Cahoon).  Maynard Shirley was armed with a knife.  See Preliminary Hearing Tr. at 38:4 (Cahoon).  In Cahoon's opinion, the knife looked like a hunting knife, not a banana knife as the witnesses to B. BlueEyes' killing described that weapon.  See Preliminary Hearing Tr. at 39:1-3 (Mott, Cahoon).  Maynard Shirley then was taken into custody.  See Record of Arrest of Maynard Shirley at 1, entered March 27, 2015 (Doc. 8)([text-only-entry]).

Subsequent to Maynard Shirley's and A. Williams' arrest, law enforcement "obtained a warrant to search bags belonging to Mr. Shirley and his fiancée that we[re] found inside the home where they were arrested."  Defendant Maynard Shirley's Motion in Limine Regarding Possession of Knives and an Axe at 2, filed September 26, 2016 (Doc. 116)("Knives and Axe Motion").

Among these belongings were "several knives, including pocketknives and a Gerber knife, as well as an axe."[2]  Knives and Axe Motion at 2.

## PROCEDURAL BACKGROUND

The United States commenced this action on March 25, 2015.  See Criminal Complaint at 1, filed March 25, 2015 (Doc. 1)("Complaint").  In the Complaint, the United States recited the foregoing facts, described the Shirley brothers' physical characteristics according to government databases, and argued that the Shirley brothers matched the descriptions provided by the witnesses who were present at the BlueEyes residence during the stabbing of B. BlueEyes and P. BlueEyes.  See Complaint ¶ 17, at 11.  Based on these allegations, the United States concluded that there was probable cause to charge E. Shirley, Maynard Shirley, and Michael Shirley with murder, aiding and abetting, and assault.  See Complaint ¶ 18, at 11-12.

The following evening, on March 26, 2015, Michael Shirley was arrested in Farmington.  See Preliminary Hearing Tr. at 40:13-18 (Cahoon).  At that point, all three Shirley brothers were in custody -- E. Shirley had surrendered on March 23, 2015, see Amended Complaint ¶ 15, at 9, and Maynard Shirley had been arrested on March 25, 2015, see Preliminary Hearing Tr. at 39:11-20 (Mott, Cahoon).

On April 14, 2015, a Grand Jury indicted E. Shirley, Maynard Shirley, and Michael Shirley on three counts: (i) unlawfully killing B. BlueEyes -- with a knife -- with malice aforethought in violation of 18 U.S.C. §§ 1153, 111, and 18 U.S.C. § 2; (ii) assaulting P. BlueEyes and causing

---

[2]The United States alleges that Maynard Shirley was in possession of a "Bear Gryllis [sic]" Gerber Knife and "Bear Gryllis [sic]" Gerber Axe.  See Knives and Axe Motion at 2.  At the hearing, the United States clarified that these items bear the eponymous name of "TV personality" and "survivalist," Bear Grylls.  Transcript of Exhibit Hearing (taken September 29, 2016) at 15:24-16:1 (Duncan).  The Court notes that the parties' briefings incorrectly refer to "Bear Gryllis," not "Bear Grylls" products.

serious bodily injury in violation of 18 U.S.C. §§ 1153, 113(a)(6), and 18 U.S.C. § 2; and (iii) assaulting P. BlueEyes with a dangerous weapon -- a knife -- with intent to inflict bodily harm in violation of 18 U.S.C. §§ 1153, 113(a)(3), and 18 U.S.C. § 2.  See Indictment at 1-2, filed April 14, 2015 (Doc. 25).  On February 25, 2016, the Court set trial for October 17, 2016.  See Order to Continue at 2, filed February 25, 2016 (Doc. 66).

On September 21, 2016, in proceedings before the Honorable William P. Lynch, United States Magistrate Judge for the District of New Mexico, Michael Shirley entered a guilty plea as to all three counts charged in the indictment.  See Clerk's Minutes for Plea Hearing held on 9/21/2016 at 1, entered September 23, 2016 (Doc. 109).  E. Shirley also pled guilty in the same proceedings.  See Clerk's Minutes for Plea Hearing held on 9/21/2016 at 1, entered September 23, 2016 (Doc. 110).  Maynard Shirley is now the sole Defendant in the case.

The United States now moves to admit Maynard Shirley's statement, allegedly made to J. BlueEyes at the BlueEyes' residence during the commission of the charged offense on March 21, 2015, to "[s]tay back, lady, or else I'm going to stab you."  Motion Reply at 6.  The United States argues that this statement is admissible as a statement by a party opponent pursuant to rule 801(d)(2)(A) of the Federal Rules of Evidence.  See Motion Reply at 1.  Maynard Shirley contends that he did not make the alleged statement.  See generally Draft Transcript of Motion Hearing held on October 17, 2016 ("Tr. 1").[3]

## LAW REGARDING HEARSAY

"Hearsay testimony is generally inadmissible."  United States v. Christy, 2011 WL 5223024, at *5 (D.N.M. 2011)(Browning, J.)(citing Fed. R. Evid. 802).  Under rule 801(c) of the Federal Rules

---

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

- 11 -

of Evidence, "hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay bars a party from presenting its own statements, such as "a defendant . . . attempt[ing] to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination." United States v. Cunningham, 194 F.3d 1186, 1199 (11th Cir. 1999)(Carnes, J.). A statement that is otherwise hearsay, however, may be offered for a permissible purpose other than to prove the truth of the matter asserted, including impeaching a witness. See United States v. Caraway, 534 F.3d 1290, 1299 (10th Cir. 2008)(Hartz, J.)("We have already explained why the content of the statement, if used substantively, would be inadmissible hearsay. If admitted for impeachment purposes, however, it is not hearsay."). Rule 805 of the Federal Rules of Evidence recognizes that "[h]earsay within hearsay" -- commonly referred to as double hearsay -- may be admissible "if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. A party opponent's statement is excluded from the definition of hearsay where:

> The statement is offered against an opposing party and:
>
> > **(A)** was made by the party in an individual or representative capacity;
> >
> > **(B)** is one the party manifested that it adopted or believed to be true;
> >
> > **(C)** was made by a person whom the party authorized to make a statement on the subject;
> >
> > **(D)** was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or
> >
> > **(E)** was made by the party's coconspirator during and in furtherance of the conspiracy.

Fed. R. Evid. 801(d)(2). The United States Court of Appeals for the Tenth Circuit has stated:

> Admissions by a party-opponent are excluded from the category of hearsay on the theory that their admissibility in evidence is the result of the adversary system rather than satisfaction of the conditions of the hearsay rule. No guarantee of

> trustworthiness is required in the case of an admission. The freedom which admissions have enjoyed from technical demands of searching for an assurance of trustworthiness in some against-interest circumstance, and from restrictive influences of the opinion rule and the rule requiring first-hand knowledge, when taken with the apparently prevalent satisfaction with the results, calls for a generous treatment of this avenue of admissibility.

Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 667 (10th Cir. 2006)(Seymour, J.)(internal quotation marks and alterations omitted).[4]

## ANALYSIS

Hearsay evidence is generally inadmissible "because it is considered unreliable." United States v. Lozado, 776 F.3d 1119, 1121 (10th Cir. 2015)(citing Williamson v. United States, 512 U.S. 594, 598 (1994)). See Fed. R. Evid. 801(c) (defining hearsay as an out of court statement offered "to prove the truth of the matter asserted in the statement"). A statement is not considered "hearsay" if it is offered against an opposing party and is the party's own statement. Fed. R. Evid. 801(d)(2)(A). The United States Court of Appeals for the Tenth Circuit has stated that proponents of such evidence "need only show by a preponderance of the evidence that the opposing party had made the statement." United States v. Brinson, 772 F.3d 1314, 1320 (10th Cir. 2014)(citing United States v. Lang, 364 F.3d 1210, 1222 (10th Cir. 2004), vacated on other grounds, 543 U.S. 1108 (2005)). See

---

[4]The 2011 restyling of the Federal Rules removed "admissions" from the language of rule 801(d) of the Federal Rules of Evidence, and uses instead the term "statements." Fed. R. Evid. 801(d). This replacement was purposeful: "The term 'admissions' is confusing because not all statements covered by the exclusion are admissions in the colloquial sense -- a statement can be within the exclusion even if it 'admitted' nothing and was not against the party's interest when made." Fed. R. Evid. 801, advisory committee's note on 2011 Amendments.

Although the advisory committee made the commentary quoted in the text regarding the trustworthiness of "admissions by a party-opponent" before the 2011 amendments to the Federal Rules of Evidence, the analysis should not be different under the new 2011 restyling of the rules. Because the advisory committee's purpose for the 2011 restyling was to make the rules "more easily understood and to make style and terminology consistent through the rules," and there was no "intent to change any result in any ruling on evidence admissibility," the analysis applied before 2011 should still be useful for cases after the restyling. Fed. R. Evid. 801.

also Bourjaily v. United States, 483 U.S. 171, 175 (1987)(stating that admissibility determinations that hinge on preliminary factual questions must be "established by a preponderance of proof").

To link Maynard Shirley to the alleged statement, the United States must show, by a preponderance of the evidence, see United States v. Brinson, 772 F.3d at 1320, that Maynard Shirley said to J. BlueEyes, on March 21, 2015: "Stay back, lady, or else I'm going to stab you." Motion Reply at 6. The United States proffers the following evidence to link Maynard Shirley to the statement: First, that, during the offense, J. BlueEyes exited her bedroom to investigate the commotion in the living room and that, as she approached, an unknown man waived a banana-shaped knife in her direction, and told her to "[s]tay back, lady, or else I'm going to stab you." Motion Reply at 6. See Amended Complaint ¶ 12, at 6. The man, whom J. BlueEyes later described as approximately five feet six inches to five feet eight inches in height, with a medium build and wearing a black hooded sweatshirt, see Amended Criminal Complaint ¶ 12, at 6, matched Maynard Shirley's description according to government databases, see Amended Criminal Complaint ¶ 17, at 10. Second, that L. BlueEyes followed J. BlueEyes out of the bedroom, and observed an unknown man threaten J. BlueEyes with a banana-shaped knife and say: "Stay back, lady, or else I'm going to stab you." Motion Reply at 6. See Amended Criminal Complaint ¶ 13, at 9. L. BlueEyes later described the man as a Native American male, approximately 5 feet 6 inches in height, with short hair and wearing a baggy hooded sweatshirt. See Amended Criminal Complaint ¶ 13, at 7. This description also matched Maynard Shirley's description according to government databases. See Amended Criminal Complaint ¶ 17, at 10. Third, that P. BlueEyes can identify Maynard Shirley as the man who stabbed him with a banana-shaped knife as he attempted to intervene and assist B. BlueEyes during the altercation. See Tr. 1 at 23:22-24 (Tapia-Brito). See also Amended Criminal

Complaint ¶ 10, at 5.  The United States indicates that each of these witnesses is prepared to testify to these accounts.  See Motion Reply at 6.

Maynard Shirley primarily objects to this final form of evidence, arguing that P. BlueEyes' in-court identification would be prejudicial and unreliable.  See Tr. 1 at 296:4-22 (Schmidt-Nowara).  The Court disagrees.  The Supreme Court of the United States has stated that it is "the likelihood of misidentification which violates a defendant's right to due process . . . ."  Neil v. Biggers, 409 U.S. 188, 198 (1972).  Thus, in determining whether an in-court identification is proper, the "primary evil to be avoided is 'a very substantial likelihood of irreparable misidentification.'"  Neil v. Biggers, 409 U.S. at 198 (quoting Simmons v. United States 390 U.S. 377, 384 (1968)).  The Supreme Court has held, however, that misidentification resulting from "unnecessary suggestiveness" alone does not require the exclusion of evidence.  Neil v. Biggers, 409 U.S. at 199.  Rather, the court must determine whether, under the "'totality of the circumstances[,]' the identification was reliable even though the confrontation procedure was suggestive."  Neil v. Biggers, 409 U.S. at 199.  See also Stovall v. Denno, 388 U.S. 293, 302 (1967)(articulating the "totality of the circumstances" test).  Here, based on the totality of the circumstances, P. BlueEyes' in-court identification of Maynard Shirley would be sufficiently reliable.  P. BlueEyes had a direct altercation with Maynard Shirley in the early morning of March 21, 2015, and the United States contends that P. BlueEyes will be able to identify Maynard Shirley as his attacker.  See Tr. 1 at 23:22-24 (Tapia-Brito).  See also Amended Criminal Complaint ¶ 10, at 5.

Maynard Shirley argues, however, that P. BlueEyes originally stated that he could not identify his attacker, and that he later identified Maynard Shirley only after he had been shown Maynard Shirley's photograph.  See Tr. 1 at 297:9-298:16 (Schmidt-Nowara).  The Supreme Court has approved of in-court identifications, however, where "witnesses made [the] identifications

arguably stemming from previous exposure to a suggestive photographic array . . . ." Neil v. Biggers, 409 U.S. at 196. In Simmons v. United States, the Supreme Court reiterated the governing test:

> [W]e hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

390 U.S. at 384. Applying this test, the Supreme Court found the in-court identifications of bank robbers to be reliable, noting that the witnesses had viewed the robbers "for periods ranging up to five minutes" and that the witnesses "were shown the photographs only a day later, while their memories were still fresh." Simmons v. United States 390 U.S. at 385. Here, P. BlueEyes allegedly saw Maynard Shirley up close during the altercation on March 21, 2015. See Amended Criminal Complaint ¶ 10, at 5. P. BlueEyes subsequently described his attacker with some detail, relaying characteristics that resemble Maynard Shirley's description. See Amended Criminal Complaint ¶ 10, at 5. That P. BlueEyes was shortly thereafter shown a photograph of Maynard Shirley was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States 390 U.S. at 384. P. BlueEyes' prior statements already indicated, with some reliability, that Maynard Shirley was his attacker.

Maynard Shirley further argues that an in-court identification is permissible only if its reliability is established by "clear and convincing evidence." Draft Transcript of Motion Hearing held on October 18, 2016, at 49:20-50:3 (Duncan)("Tr. 2").[5] Indeed, in the context of a pre-trial lineup identification where counsel was not present, the Supreme Court has stated that the

---

[5] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

Government must have "the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." United States v. Wade, 388 U.S. 218, 240 (1967)(citation omitted). Accordingly, "a *per se* rule of exclusion of courtroom identification [is] unjustified." United States v. Wade, 388 U.S. at 240 (citation omitted). In United States v. Wade, the Supreme Court articulated the test to be applied in such circumstances: "'[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" 388 U.S. at 240 (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963))(alterations in original). The Supreme Court elaborated that application of the test requires consideration of various factors, such as

> the prior opportunity to observe the alleged criminal act, the existence of any discrepancy between any pre-lineup description and the defendant's actual description, any identification prior to lineup of another person, the identification by picture of the defendant prior to the lineup, failure to identify the defendant on a prior occasion, and the lapse of time between the alleged act and the lineup identification.

United States v. Wade, 388 U.S. at 241. Regardless of the specific application of this test, the in-court identification may still be permissible if "the introduction of the evidence was harmless error." United States v. Wade, 388 U.S. at 240 (citing Chapman v. California, 386 U.S. 18 (1967)).

Here, the United States has "clear and convincing evidence" that P. BlueEyes' in-court identification of Maynard Shirley is based on "means sufficiently distinguishable to be purged of the primary taint." United States v. Wade, 388 U.S. at 240 (internal quotation marks and citation omitted). Before being shown the photograph of Maynard Shirley after the incident, P. BlueEyes described his attacker as an unknown Native American male and a "little guy," about five feet eight inches in height with a medium build and a "marine" haircut. Amended Criminal Complaint ¶ 10, at

4.   This description closely matched Maynard Shirley's description in various state government databases.  See Amended Criminal Complaint ¶ 17, at 10.  Accordingly, the Court concludes that P. BlueEyes' in-court identification would be "based upon observations of [Maynard Shirley] other than the [pretrial] identification."  United States v. Wade, 388 U.S. at 240.  The Court also notes that P. BlueEyes was not shown Maynard Shirley's photograph by law enforcement officials in a traditional, suggestive lineup, but by a family member in his hospital room.  See Tr. 1 at 181:12-182:14 (Tapia-Brito).  Thus, the dangers generally associated with pretrial lineup identification are not present in this case, because the photograph was not shown to P. BlueEyes in such circumstances.  Regardless whether the photograph was suggestive, however, the Court concludes that P. BlueEyes' in-court identification would be sufficiently based on his observations independent from the photograph.  See United States v. Wade, 388 U.S. at 240.

   Maynard Shirley objects, arguing that the analysis in United States v. Ghayth, 990 F. Supp. 2d 427 (S.D.N.Y. 2014)(Kaplan, J.), compels a contrary result.  This argument is unpersuasive.  The court in United States v. Ghayth applied the same test that the Supreme Court articulated in United States v. Wade to determine whether a "witness who makes an out-of-court identification in unduly suggestive circumstances may perform an in-court identification . . . ."  United States v. Ghayth, 990 F. Supp. 2d at 432.  To be permissible, the court stated, the in-court identification must be reliable by "rest[ing] on an independent source."  990 F. Supp. 2d at 432.  The Court has already applied this standard to the proffered in-court identification in this case, supra, and determined that such identification would be sufficiently reliable based on P. BlueEyes' independent observations of Maynard Shirley.  Moreover, in United States v. Ghayth the court observed that suggestive out-of-court identifications are frequently upheld even "where the eyewitness had been exposed to images of the suspect in the media."  990 F. Supp. 2d at 433.  The court elaborated that, "[i]n such cases, the

witness first witnesses a crime, then sees a media report depicting the image of the suspected criminal, and later selects that person as the perpetrator from a photograph array." 990 F. Supp. 2d at 433.  Here, as with exposure to an image of a suspect in the media, P. BlueEyes was exposed to Maynard Shirley's image by non-law enforcement personnel.  Such exposure is not so unduly suggestive, nor the taint so strong, as to warrant exclusion of P. BlueEyes' in-court identification.

Accordingly, based on this analysis, the Court concludes that the United States has sufficiently established, by a preponderance of the evidence, see United States v. Brinson, 772 F.3d at 1320, a link between the proffered statement -- "[s]tay back, lady, or else I'm going to stab you" -- and Maynard Shirley.  In light of controlling Supreme Court precedent, the Court concludes that P. BlueEyes' in-court identification of Maynard Shirley will not violate Maynard Shirley's right to due process, see Neil v. Biggers, 409 U.S. at 198, and that the statement is admissible as a declaration of a party-opponent under rule 801(d)(2)(A).  The Court notes that Maynard Shirley is entitled to dispute the accuracy and probative value of such in-court identification -- but rather than merit exclusion of the identification, arguments indicting the accuracy and probativity of such identification simply go to the weight of the evidence.

**IT IS ORDERED** that the request with respect to Defendant Maynard Shirley's alleged statement to Janet BlueEyes to "[s]tay back, lady, or else I'm going to stab you" in the United States' Reply to Defendant's Response to United States Motion in Limine to Admit Defendant's Statements Made During Flight, Shirley and Statements by Althea Shirley for their Effect Upon the Listener at 6, filed October 16, 2016 (Doc. 147), is granted.  The Court will allow Janet BlueEyes to testify that Maynard Shirley said to her "[s]tay back, lady, or else I'm going to stab you," but only after Perry BlueEyes makes an in-court identification of Maynard Shirley.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
  United States Attorney
Linda Mott
Niki Tapia-Brito
Nicholas James Marshall
  Assistant United States Attorneys
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*


Mary (Molly) E. Schmidt-Nowara
Garcia Ives Nowara
Albuquerque, New Mexico

-- and --

Theresa M. Duncan
Albuquerque, New Mexico

    *Attorneys for Defendant Maynard Shirley*